```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  01/05/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JAMES R. CONKLIN,                                                :

                                                                 :     **OPINION AND**

                                  Plaintiff,                     :     **ORDER**

                                                                 :

                                                                 :     21-CV-8486 (JLC)

      -v-                                                        :

                                                                 :

KILOLO KIJAKAZI,                                                 :

ACTING COMMISSIONER OF SOCIAL                                    :

SECURITY,[1]                                                     :

                                                                 :

                                  Defendant.                     :
------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

     James Conklin seeks judicial review of a final determination made by Kilolo

Kijakazi, the Acting Commissioner of the Social Security Administration, denying

his application for disability insurance benefits under the Social Security Act.  The

parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure.  For the reasons set forth below, Conklin's

motion is granted, the Commissioner's cross-motion is denied, and the case is

remanded for further proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the
Acting Commissioner is substituted for the Commissioner as the defendant in this
action.

# I.   BACKGROUND

## A. Procedural History

Conklin applied for disability insurance benefits on May 18, 2018, alleging a disability onset date of April 8, 2017, due to seizures, depression, anxiety, and suicidal thoughts.  Administrative Record ("AR"), Dkt. No. 14, at 195.  The Social Security Administration ("SSA") denied Conklin's claim on July 19, 2018.  *Id* at 105.  Conklin, represented by counsel, appeared and testified at a hearing held on October 30, 2019 before Administrative Law Judge ("ALJ") Laura Michalec Olszewski.  *Id.* at 45–88.  In a decision dated March 27, 2020, ALJ Michalec Olszewski found that Conklin was not disabled.  *Id.* at 30.  On August 10, 2021, the Appeals Council denied a request for review, making the ALJ's decision the final agency action.  *Id.* at 1–3.

Conklin timely commenced this action on October 14, 2021, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §405(g).  *See* Complaint, Dkt. No. 1.  The Commissioner answered Conklin's complaint by filing the administrative record on February 28, 2022.  Dkt. No. 14.  On April 29, 2022, Conklin moved for judgment on the pleadings and submitted a memorandum of law in support of the motion.  Motion for Judgment on the Pleadings, Dkt. No. 16; Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 17.  On August 29, 2022, the Commissioner cross-moved for judgment on the pleadings and submitted a memorandum in support of the cross-motion.  Notice of Cross-Motion for Judgment on the Pleadings, Dkt. No.

20; Memorandum of Law in Support of Commissioner's Cross-Motion for Judgment

on the Pleadings ("Def. Mem."), Dkt. No. 21.  Conklin filed a reply on September 19,

2022.  Dkt. No. 22.

### B. Administrative Record

#### 1. Conklin's Background

Conklin was born on May 11, 1978 and lives in Beacon, New York.  AR at 13,

29.  He completed tenth or eleventh grade.  *Id* at 52, 216.  He previously worked as

a delivery driver, tow truck driver, assistant manager, and laborer, but has not

engaged in substantial gainful activity since April 8, 2017.  *Id.* at 18, 216.  On that

day, Conklin was admitted to the emergency room, "presenting with two days of

tremors and intermittent confusion."  *Id.* at 818.  Following that emergency room

visit, over the next two years, Conklin presented to a series of medical experts for

evaluations.  *Id.* at 94, 96, 401, 416, 449, 1080.  In November 2017, Conklin

underwent a neuropsychological evaluation from a doctor who concluded that

Conklin's seizures were likely "psychological in origin" and that "given the

uncontrolled nature of [his] seizures, the ongoing nature of his PTSD symptoms

(including recurring flashbacks), and signs of diffuse cognitive dysfunction

(particularly problems with memory), Mr. Conklin [was] not capable of working . . . ,

warranting initiation of disability benefits."  *Id.* at 401.

Conklin suffers from the severe impairments of "obesity, seizure disorder,

sleep apnea, fibromyalgia, status post traumatic brain injury (TBI), headaches,

hernia, anxiety disorder, depression, and posttraumatic stress disorder (PTSD)."
*Id.* at 19.  Conklin also alleges that he suffers from neuropathy.  *Id.*

### 2.  Relevant Medical Evidence

Conklin and the Commissioner have each provided a summary of the medical
evidence contained in the administrative record.  *See* Pl. Mem. at 4; Def. Mem. at 6–
8.  "The Court adopts these summaries, which do not materially conflict with each
other, as accurate and complete for the purpose of considering the issues raised in
this suit, except to the extent [it] discuss[es] additional records below."  *Marinez v.
Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 210 (S.D.N.Y. 2017).  The Court will
discuss the medical evidence pertinent to the adjudication of this case in Section
II(B) of this opinion.

### 3.  ALJ Hearing

#### a.   Conklin's Testimony

On October 30, 2019, Conklin appeared at a hearing before ALJ Michalec
Olszewski, represented by his attorney, Gabriel J. Hermann ("Hermann").  AR at
45.  Vocational Expert ("VE") Esperanza Distefano, M.S., also appeared and
testified.  *Id.*  At the time of the hearing, Conklin was 41-years-old, married, and
living in a house with his wife and his parents-in-law.  *Id.* at 52–53.

In response to the ALJ's questions, Conklin explained that he had two
children who lived with their mother, and who came and stayed with him for two
months each summer and between Christmas and New Year's.  *Id.* at 53.  The ALJ
asked Conklin if his wife works; he responded that she does not, as "she takes care

of [him]." *Id.* Conklin explained that his wife "has poor health too"—"bad knees, scoliosis and other issues"—but she has not applied for disability. *Id.* at 54. The ALJ asked Conklin how he supports himself, and he replied that he and his wife stay with his wife's parents (only his father-in-law works) and "are collecting food stamps right now." *Id.* Conklin explained that he, his wife, and his mother-in-law are typically home all day. *Id.* Conklin does not drive, and relies on his wife or his father-in-law for transportation. *Id.* at 55.

The ALJ then asked Conklin about his work history over the last 15 years. *Id.* at 56. Conklin explained that his last full-time job was in 2016 as a delivery person, driving and picking up packages. *Id.* at 56–57. Before that, he worked full-time for a tent rental company, delivering, putting up, returning, and washing tents. *Id.* at 57. Prior to that, he worked for a towing service as a tow truck driver, and before that, he worked at Home Depot, did seasonal delivery work for UPS, worked at Dunkin' Donuts, and worked for a different towing service. He also worked several part-time jobs throughout that 15-year period. *Id.* at 57–60.

Conklin testified that he has not worked at all since April 2017. *Id.* at 60. When the ALJ asked him about his typical day, Conklin responded that he gets up, takes his medication, which makes him tired and "puts [him] back down." *Id.* at 60. Then he wakes up again, tries "to help out around the house a little" but once he takes his medication again, he becomes tired, "and then it's like a repeat all over again." *Id.* at 60–61. He takes his medication again around 7 p.m. and "start[s] dragging again." *Id.* at 61.

When the ALJ asked how he helps out around the house, Conklin replied that he does "a little." *Id.* He "help[s] out with laundry" and "tr[ies] to help mow . . . the lawn but [he] ha[s] to . . . take [his] time . . . because it wears [him] down." *Id.* The same goes for sweeping and raking—he replied that "it wears [him] down" and "it takes a lot out of [him;] it hurts [his] feet, it hurts [his] back." *Id.* The ALJ asked if he uses "a push mower," and he replied that he does. *Id.* The ALJ asked Conklin how often he mowed the lawn and he replied that he "tr[ies] to do it at least once" a week. *Id.* at 62. Conklin also answered that he uses laundry machines located on the first floor of the house. *Id.*

The ALJ asked Conklin what he meant when he says that he has to "rest a lot." *Id.* Conklin replied: "I get a lot of pain and I lay with my back where I get really bad headaches, so I have to lay down and like rest my head. Sometimes I have to lay in a dark room." *Id.* When further questioned, Conklin explained that his headaches sometimes last "for three or four days" and that he has to lay in a dark room "maybe two days a week" for an hour or two. *Id.* at 62–63.

The ALJ probed Conklin further about his daily activities, and he replied that he does not "watch a lot of TV" or "do a lot of reading," but he does "color a lot in a book" and often goes for two-or three-block walks at night with his wife, staying on the side streets to avoid the "bright lights of cars" which "bother [his] eyes." *Id.* at 63–64. Conklin relayed that he went fishing maybe twice this year, and "tried to go fishing over the summer but [he] had a seizure doing it." *Id.* at 64–65.

Conklin denied building shelves or doing construction on the property where he lives. *Id.* at 66. He explained that his sister comes to visit him sometimes, *id.*, but that he does not go to visit family; in fact he did not go to a family reunion because his doctor was worried about his health and if he would be able to "stand long." *Id.* at 67.

Conklin was then questioned by his attorney, Hermann, first about a surgery he underwent in 2018 to remove a cyst from his tailbone. *Id.* at 47, 68. Hermann asked Conklin to explain why he feels unable to work the kind of jobs he used to, and Conklin replied that he has "trouble now bending over, getting [his] shoes on," and he has "really bad headaches." *Id.* at 69. Hermann asked Conklin to describe his headaches, and Conklin replied: "I get them and now they last sometimes now for a few days where I have to shake my head into the pillows, and if it was position like in my hands and my knees into a pillow." *Id.* The attorney asked Conklin about his seizures, and Conklin explained that he has "been getting them maybe three or four times a month, but [he has not] been going to the hospital every time [he] get[s] them." *Id.* When he gets them, he explained, he "fall[s] to the ground, . . . shake[s] uncontrollably, . . . sometimes he soil[s] himself, [and he] can't remember anything." *Id.* at 70. He relayed that his episodes typically last around 45 minutes, and that afterwards, it takes him about a day to recover because his muscles have to "adjust" after being "tense[d] up during an episode." *Id.* at 70–71.

Hermann asked if Conklin takes medication to control his seizures, and Conklin replied that he does. *Id.* at 71. Hermann asked if Conklin's seizure

medication makes him "tired and out of it during the day," and if he still gets seizures while taking the medication, and Conklin replied "yes." *Id.*, *id.* at 73. Conklin explained that he also takes medication for depression and PTSD. *Id.* at 72. Hermann asked what happens when Conklin gets triggered for his PTSD, and Conklin replied "a different person comes out." *Id.* Hermann asked if Conklin is "able to control what the other person does," and Conklin replied: "[n]ot all the time." *Id.* When pushed to describe what happens, Conklin described his other self as "a very violent person" and that he "tried killing [him]self with that person." *Id.*

Hermann then asked how he gets along with other people. *Id.* at 73. Conklin responded that he "was told [he] can . . . be mean towards other people [and] . . . be kind towards other people, [and] that's why [he] ha[s] a split personality." *Id.* at 74. Conklin explained that he does not "like to go shopping" because he "can't walk around stores a lot" because "it hurts [his] legs . . . [and] body," and because he "can't deal with crowds." *Id.* The ALJ asked Conklin what he does when his children come to visit during the summer. *Id.* at 76. Conklin replied: "[w]e'll go to the park and I'll sit . . . at the bench and I'll let them play . . . and watch them ride their bikes." *Id.* He explained that his wife and sister take the kids to his nephew's to "bounce and stuff like that, but [he] can't go there because . . . they have flashing lights." *Id.*

Hermann then followed up with Conklin about the chores he reported doing around the house. *Id.* at 77. Hermann asked Conklin if he mows the lawn all at once or breaks it up. *Id.* at 77–78. Conklin responded that he does "like a little

every hour," that the lawn is "not very big, only say maybe 40 by 60," and that

mowing it takes "maybe four hours."  *Id.* at 77–78.

**b.    VE's Testimony**

At the hearing, the VE identified four jobs that corresponded to Conklin's

prior work history: delivery driver, tow truck driver, counter attendant, and laborer.

*Id.* at 80–81.   The ALJ then posed a hypothetical individual to the VE:

> [of Conklin's] age and education with the past jobs described [who] . . .
> can work at the light exertional level and . . . can lift and/or carry 20
> pounds occasionally, ten pounds frequently, . . . can sit for six hours in
> an eight-hour work day, . . . can occasionally climb ramps and stairs,
> but should never climb ladders and scaffolds, . . . can occasionally
> balance and stoop, . . . should never kneel, crouch, or crawl[.]  [T]he
> individual should work in a low stress environment defined as
> occasional use of judgment, occasional decision making and occasional
> changes in the work setting.  They can perform simple and routine
> tasks, they can have occasional indirections with supervisors,
> coworkers, public, they should avoid unprotected heights, operation of
> motor vehicles and operation of heavy—of hazardous machinery, and
> finally the individual can have occasional exposure to respiratory
> irritants such as dust, odors, fumes, gases, and extreme hot and cold
> temperatures.

*Id.* at 81–82.  The ALJ asked the VE if this hypothetical individual could perform

any of Conklin's past work, and the VE replied that he could not.  *Id.* at 82.  The

ALJ queried whether the hypothetical individual could do any work, and the VE

responded in the affirmative.  *Id.*  She explained that "such an individual would be

able to perform the job of a marker, . . . a light exertion, unskilled position . . . [of

which there] are 124,762 [available] nationally[;] . . . a silver wrapper, . . . a light

exertion, unskilled position [of which there] are 11,773 [available] nationally; . . .

[and] a router, . . . a light exertion, unskilled position [of which there] are 34,958

positions nationally."  *Id.*

9

The ALJ asked the VE how much employers would tolerate off task behavior. *Id.* The VE replied that "[m]ost employers will tolerate 10% off task, most employers will not tolerate 20% off task, [and that in her] opinion if an individual is off task 15% of the time there would be at least a 50% erosion of jobs such an individual would be able to maintain." *Id.* at 82–83.

The ALJ then questioned the VE about employers' toleration for absenteeism. *Id.* at 83. The VE responded that "[m]ost employers . . . permit" one absence per month, and that in her opinion an individual who is absent more than once a month "would be unable to maintain employment." *Id.* Conklin's attorney posed to the VE the hypothetical of an employee who causes a disruption "taking other employees off task" once a month and then has to go home (*i.e.* because of a seizure), and asked whether that hypothetical individual would be able to stay employed. *Id.* at 85. The VE responded that if "corrective action is not attended to then the individual may lose their employment." *Id.* The attorney then asked what would happen to an individual who, "when approached by a supervisor is either non-responsive or offers inappropriate response of whatever nature, silence or inappropriate verbiage." *Id.* at 86. The VE replied that such an individual would "definitely . . . have corrective action" and some employers would "immediately terminate" them. *Id.*

### 4.  The ALJ's Decision

In a decision dated March 27, 2020, ALJ Michalec Olszewski denied Conklin's application for disability benefits, concluding that Conklin was not disabled under sections 216(i) and 223(d) of the Social Security Act from April 8,

2017 through the date of the decision. *Id.* at 17, 30. In her analysis, the ALJ

followed the five-step test for reviewing Social Security claims set forth in SSA

regulations. *Id.* at 17–18. At step one, she noted that Conklin had not engaged in

substantial gainful activity since his alleged onset date. *Id.* at 18. At step two, she

determined that Conklin suffered from the following "severe impairments: obesity,

seizure disorder, sleep apnea, fibromyalgia, status post traumatic brain injury

(TBI), headaches, hernia, anxiety disorder, depression, and posttraumatic stress

disorder (PTSD)." *Id.* at 19.

At step three, the ALJ concluded that the record had "fail[ed] to establish

that [Conklin] has an impairment or combination of impairments that meets or

medically equals the criteria of any . . . impairment" listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1, as records available did not "document signs, symptoms,

and/or laboratory findings indicating any impairment or combination of

impairments severe enough to meet the criteria of any listed impairment" and "[n]o

treating, examining, or non-examining medical source . . . mentioned findings or

rendered an opinion that the claimant's impairments, singly or in combination,

medically equaled the criteria of any listed impairment." *Id.* at 20.

The ALJ explained the reasoning for her conclusion at step three in reference

to five listings: disorders of the spine (1.04); epilepsy (11.02); and certain mental

impairments (12.04, 12.06, 12.15). *Id.* With respect to spine disorders, the ALJ

explained that the record did "not include the required findings on appropriate

medically acceptable imaging or positive straight leg raising tests, and [Conklin] is

11

able to ambulate effectively." *Id.* With respect to epilepsy, the record did "not include evidence that [Conklin] experienced . . . seizures with the required frequency," and "his reported activities of . . . household chores and yardwork" demonstrated that he did not "have marked limitation in physical or mental functioning." *Id.* Finally, the ALJ concluded that Conklin's documented mental impairments did not meet the criteria for listings 12.04, 12.06, and 12.15 because Conklin had a moderate limitation, rather than a marked or an extreme one. *Id.* at 21. In reaching the conclusion that Conklin's limitation was moderate, the ALJ focused primarily on—and spent about a page discussing—the findings of consultative psychiatric examiner, Alex Gindes, Ph.D. *Id.* at 21–22. Specifically, she relied on Dr. Gindes' notation that Conklin's recent and remote memory was impaired, along with Conklin's statements at the hearing. *Id.* at 21. The ALJ also noted that Dr. Gindes "assessed [Conklin's] insight and judgement as fair." *Id.*

At step four, the ALJ determined Conklin has the RFC

> to perform light work . . . except [he] can occasionally climb ramps and stairs but should never climb ladders and scaffolds. He can occasionally balance and stoop. He should never kneel, crouch and crawl. He should work in a low stress environment defined as occasional use of judgment, occasional decision-making, and occasional changes in work setting. He can perform simple and routine tasks. He can have occasional interactions with supervisors, coworkers and the public. He should avoid unprotected heights, operation of motor vehicles, and operation of hazardous machinery. Finally, he can have occasional exposure to respiratory irritants such as dust, odors, fumes and gases and extreme hot and cold temperatures.

*Id.* at 22. To reach this conclusion, the ALJ considered "all symptoms . . . reasonably . . . consistent with the objective medical evidence and other evidence" in

a two-part analysis: first she determined whether Conklin had any "medically determinable physical or mental impairments[s]"—as shown "by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the [claimed] . . . symptoms."  *Id.*  Second, she "evaluate[d] the intensity, persistence, and limiting effects of [Conklin's] symptoms to determine the extent to which they limit [his] work-related activities."  *Id.*  Where objective medical evidence was unavailable, she considered other record evidence.  *Id.* at 22–23.

The ALJ then assessed Conklin's credibility, and found that his "medically determinable impairments could reasonably be expected to cause" the symptoms he alleged, but that his "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [was] not entirely consistent" with medical and non-medical evidence.  *Id.* at 23.  For instance, his statements about the "intensity, persistence, and limiting effects of his symptoms" were inconsistent with the daily activities he testified to such as doing the laundry, mowing the lawn, raking leaves, helping "a friend remodel his bathroom," and "go[ing] for evening walks with his wife."  *Id.*  Nor, according to the ALJ, did medical evidence support Conklin's claimed seizures—"on multiple occasions, [he] told his medical providers that his seizure activity had decreased[,] . . . pharmacy records [did] not reflect that [he was] refilling his anti-seizure medications[, and] [o]bjective testing failed to find any epileptic activity[,] leading his doctors to conclude that his seizures were psychologically related."  *Id.*

The ALJ also assessed each medical evaluation in the record in turn and determined whether it was persuasive based on its supportability and consistency with objective medical evidence. *See id.* at 26–28. Specifically, the ALJ noted Dr. Gindes' diagnoses of Conklin and his opinion that Conklin:

> had moderate limitation in understanding, remembering, and applying simple directions and instructions; extreme limitation in understanding, remembering, and applying complex directions and instructions and using reason and judgment to make work related decisions; and marked limitation in interacting adequately with supervisors, coworkers, and the public, sustaining concentration, performing a task at a consistent pace, sustaining an ordinary routine and regular attendance at work, regulating emotions, controlling behavior, and maintaining well-being.

*Id.* at 27. The ALJ concluded that Dr. Gindes' "opinion [was] not persuasive because the "extreme limitations [he mentioned were] not consistent with or supported by the objective medical evidence and longitudinal treatment record, [and was] inconsistent with the claimant's admitted activities of daily living set forth above." *Id.*

The ALJ also concluded that although Conklin's "capacity to perform work is affected," he "retains the [RFC] to perform the exertional demands of light work, with . . . limitations." *Id.* at 28. In the final component of step four, the ALJ concluded that Conklin is "unable to perform any past relevant work"—as a delivery driver, tow truck driver, counter attendant, or laborer. *Id.* at 28–29.

Finally, at step five, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Conklin] can perform." *Id.* at 29. The conclusion was supported by the VE's testimony that Conklin would be able to "perform the requirements of occupations such as" marker, silver wrapper, and

14

router.  *Id.* at 30.  Thus, the ALJ found Conklin "not disabled" under the Social
Security Act.  *Id.* at 30.

## II.    DISCUSSION

### A.  Legal Standards

#### 1.  Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the
Commissioner "in the district court of the United States for the judicial district in
which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine
whether the Commissioner's final decision applied the correct legal standards and
whether the decision is supported by "substantial evidence."  *Butts v. Barnhart,* 388
F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla. It
means such relevant evidence as a reasonable mind might accept as adequate to
support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting
*Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and
alterations omitted); *see also Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019)
("Under the substantial-evidence standard, a court looks to an existing
administrative record and asks whether it contains 'sufficien[t] evidence' to support
the agency's factual determinations . . . whatever the meaning of 'substantial' in
other contexts, the threshold for such evidentiary sufficiency is not high." (quoting
*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review."
*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court

"must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).  Specifically, the Commissioner's decision must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Id.* (citations omitted).

### a.   Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is presently employed.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *See id.*; 20 C.F.R. § 404.1520(d).

If the claimant alleges a mental impairment, "the regulations further require that the [Commissioner] 'rate the degree of [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis.'" *Rosario v. Kijakazi*, No. 20-CV-5490 (JPC) (BCM), 2022 WL 875925, at *11 (S.D.N.Y. Mar. 15, 2022) (quoting 20 C.F.R. § 404.1520a(c)(2)), *adopted by* 2022 WL 976879 (Mar. 31, 2022).  "The degree of functional limitation is rated in 'four broad functional areas,' including the claimant's ability to '[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and

adapt or manage oneself.'" *Id.* (quoting 20 C.F.R. § 404.1520a(c)(3)).  The

Commissioner uses a five-point scale to determine the degree of limitation in each

area: None, mild, moderate, marked, and extreme.  *See* 20 C.F.R. § 404.1520a(c)(4).

"These ratings are used both at step two, to determine whether a mental

impairment is 'severe,' and at step three, to determine whether a severe mental

impairment meets or medically equals a listed impairment."  *Rosario*, 2022 WL

875925, at *11.

　　If the claimant's impairment does not meet or equal a listed impairment,

then the Commissioner continues to the fourth step and determines whether the

claimant has the residual functional capacity ("RFC") to perform his or her past

relevant work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not

have the RFC to perform past relevant work, the Commissioner completes the fifth

step and ascertains whether the claimant possesses the ability to perform any other

work.  *See* 20 C.F.R. § 404.1520(a)(4)(v).

　　The claimant has the burden at the first four steps.  *See Burgess v. Astrue*,

537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to

the Commissioner at the fifth and final step, where the Commissioner must

establish that the claimant has the ability to perform some work in the national

economy.  *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.   Duty to Develop the Record

　　"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *See Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Peña v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law." (citing

20

*Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999))).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.    Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Peña ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation marks omitted).  For claims filed after March 27, 2017, as Conklin's is, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinions or prior administrative medical findings." *See, e.g., Colgan,* 22 F.4th at 359 n.2 (citing 20 C.F.R. §§ 404.1520c(a)) (cleaned up).  "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors': (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'" Id. (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416 920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies.  20 C.F.R. §§ 404.1520c(a)–(b),

416 920c(a)–(b).  The ALJ must "explain how [she] considered" both the supportability and consistency factors, as they are "the most important factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Russ v. Comm'r of Soc. Sec.*, No. 20-CV-6389 (RWL), 2022 WL 278657, at *6 (S.D.N.Y. Jan. 31, 2022) (the "regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight," referring to the supportability and consistency factors).  Evaluating "supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *adopted by* 2022 WL 717612 (Mar. 10, 2022).  With regard to consistency, "the greater the consistency between a particular medical source/opinion and the other evidence in the medical record, the stronger that medical opinion becomes." *Id.* (citing 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(3)); *see generally* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion).  *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "[W]hen the opinions offered by two or more medical sources about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the

same, the ALJ [should] articulate how [s]he considered the remaining factors in evaluating the opinions." *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 8 (W.D.N.Y. 2021) (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)) (internal quotations removed).

"The failure to properly consider and apply" the supportability and consistency factors "is grounds for remand." *Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021); *see also Rosario v. Comm'r of Soc. Sec.,* No. 20-CV-7749 (SLC), 2022 WL 819910, at *8 (S.D.N.Y. Mar. 18, 2022) ("ALJ must explain in all cases how [he or she] considered" supportability and consistency); *Rivera v. Comm'r of Soc. Sec.*, No. 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *adopted by* 2021 WL 134945 (Jan. 14, 2021) (remanding so ALJ can "explicitly discuss both the supportability and consistency of the consulting examiners' opinions"). "An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d at 265). However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *See Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Peña*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot alone establish disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the

24

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record."  *Id*. (citing 20 C.F.R. § 404.1529(a)).

Among the kinds of evidence that the ALJ must consider (in addition to objective

medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's pain
> or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (*e.g.*, lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Peña*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

### B. Analysis

Conklin contends that the ALJ failed to explain the supportability and

consistency of Dr. Gindes' opinion with respect to her mental RFC determination.

Pl. Mem. at 9–10.  According to Conklin, the ALJ's "conclusory statement"

regarding the opinion of Dr. Gindes "does not provide for meaningful review" and

thus warrants remand.  *Id.* at 12.  The Commissioner counters that the ALJ's

decision properly applied the new regulations and is supported by substantial

evidence.  Def. Mem. at 12–13.  As discussed below, the Court concludes that the

ALJ failed to properly evaluate the opinion of Dr. Gindes.  Because the ALJ erred in

this regard and this error was not harmless, the Court's analysis need not proceed

further.  *See, e.g., Santos v. Kijakazi*, No. 21-CV-1682 (JLC), 2022 WL 4354372, at

\*8 (S.D.N.Y. Sept. 20, 2022).

### 1.  The ALJ Failed to Properly Evaluate Dr. Gindes' Opinion

SSA regulations require the ALJ to explicitly discuss the supportability and

consistency of each medical opinion in making her RFC determination; the failure to

do so constitutes legal error.  *See, e.g., Acosta-Cuevas*, 2021 WL 363682, at \*14

(regulations "require an ALJ to explain how persuasive she found the medical

opinions she considered, and specifically, how well a medical source supports their

own opinion(s) and how consistent a medical source/opinion is with the medical

evidence as a whole"); *Velasquez v. Kijakazi*, No. 19-CV-9303 (DF), 2021 WL

4392986, at \*25 (S.D.N.Y. Sept. 24, 2021) (ALJ committed legal error by, *inter alia*,

failing to articulate supportability and consistency factors); *see also* 20 C.F.R. §

404.1520c(a) ("The most important factors we consider when we evaluate

persuasiveness of medical opinions and prior administrative medical findings are

supportability . . . and consistency.").  Specifically, the ALJ must "explain her

findings regarding the supportability and consistency for each of the medical

opinions [by] pointing to specific evidence in the record supporting those findings."

*Raymond M. v. Comm'r of Soc. Sec.*, No. 19-CV-1313 (ATB), 2021 WL 706645, at \*8

(N.D.N.Y. Feb. 22, 2021) (citations and quotations omitted).

In determining that Dr. Gindes' opinion was unpersuasive, the ALJ failed to

explain her findings with respect to the supportability and consistency factors.  Her

discussion of these factors consisted solely of the following statements: 1) the

"extreme limitations [Dr. Gindes found] are not consistent with or supported by the objective medical evidence and longitudinal treatment record, described above," and 2) they are "[l]ikewise . . . inconsistent with [Conklin's] admitted activities of daily living set forth above."  AR at 27.

Conklin contends that the ALJ's "conclusory statement[s]" with respect to Dr. Gindes' opinion are inadequate because they were "boiler plate," and did not "explain how the supportability and consistency factors were considered in the determination or decision."  Pl. Mem. at 10 (quoting 20 C.F.R. § 404.1520c(b)(2)), 11.

The Court agrees with Conklin.  The language does not "explain how . . . the supportability and consistency factors" were specifically considered, as is required by 20 C.F.R. § 404.1520c(b)(2).[2]  In fact, 20 C.F.R. § 404.1520c(b)(2) requires the ALJ to, "*on a source-level,* 'explain [her] approach with respect to the supportability and consistency factors when considering a medical opinion.'"  *Prieto*, 2021 WL 3475625 at *13 (quoting *Vellone v. Saul*, No. 20-CV-261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *adopted by* 2021 WL 2801138 (July 6, 2021)) (cleaned up) (emphasis added).  As explained more fully below, the ALJ's statements do not meet the requirements set forth in the applicable regulation.

---

[2] The same defect was present in the ALJ's treatment of other medical opinions she evaluated.  *See, e.g.,* AR at 27 ("The undersigned finds [the] opinion [of Dr. Kumar] persuasive because it is consistent with and supported by the objective medical evidence and longitudinal treatment record, described above.").  As Conklin only challenges the ALJ's analysis of Dr. Gindes' evaluation, and as the Court concludes the ALJ's consideration of Dr. Gindes' evaluation was legally inadequate and that it was not harmless, this opinion will not address deficiencies with respect to the ALJ's analysis of other medical opinions.

### a. Supportability

"[S]upportability, under the new regulations, has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support her opinion." *Rivera*, 2020 WL 8167136, at *16 (internal quotations and citations omitted). "[T]he strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Rosario*, 2022 WL 819810, at *8 (quoting *Vellone*, 2021 WL 319354, at *6 (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1))).

For instance, in *Rosario v. Commissioner*, the ALJ's supportability explanation was found to be "legally sufficient" because it listed the claimant's specific treatment records and concluded that they "reflect essentially normal mental status examinations and improvement with medication." 2022 WL 819810, at 10. On the other hand, in *Prieto v. Commissioner,* the ALJ's sole explanation was that "[the medical opinion is] supported by the medical evidence of record and by [the claimant's] underlying examination." 2021 WL 3475625, at *13. There, the court concluded that the explanation was "a conclusory statement[,] . . . an insufficient explanation of the supportability factor[,] and [therefore] grounds for remand." *Id.* The conclusory statement in *Prieto* is analogous to the statements that Conklin challenges.

Here, the ALJ did not address, let alone discuss in any detail, how Dr. Gindes' conclusions were supported by his own findings. Instead, she stated only

that the "extreme limitations" mentioned in Dr. Gindes' reports were unsupported by "the objective medical evidence[,] longitudinal treatment record, . . . [and Conklin's] admitted activities of daily living." AR at 27. The statement is at best ambiguous as to whether the "medical evidence" and "treatment record" she mentioned included Dr. Gindes' own findings, and she did not refer specifically to any medical evidence, treatment record, or activities. As the ALJ's explanation of supportability with respect to Dr. Gindes' evaluation did not even mention his own findings—the basis of the supportability factor—her analysis is inadequate under the regulations. *See, e.g., Rivera*, 2020 WL 8167136, at *16 (ALJ "did not discuss whether the opinions of [two doctors] were supported by the evidence and explanations that they presented in their reports" and thus "failed adequately to explain . . . supportability factor" (cleaned up)).

### b. Consistency

"Consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical source had available to them." *Acosta Cuevas*, 2021 WL 363682, at *10. An ALJ is "expressly authorized—indeed, required—to consider whether [a physician's] opinion [is] consistent with the entire record." *DuBois v. Comm'r of Soc. Sec.*, No. 20-CV-8422 (BCM), 2022 WL 845751, at *8 (S.D.N.Y. Mar. 21, 2022) (internal quotations omitted). Consideration of the entire record entails weighing "all of the evidence available." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

Here, the extent of the ALJ's explanation for why she did not find Dr. Gindes'
"opinion . . . persuasive" was that it was "not consistent with or supported by the
objective medical evidence and longitudinal treatment record, [and was]
inconsistent with the claimant's admitted activities of daily living set forth above."
AR at 27.  But Dr. Gindes' evaluation appears consistent with at least some of the
objective medical evidence in the record.  For instance, Dr. Robert Troblinger's
conclusion that Conklin's seizures, PTSD symptoms, and "signs of diffuse cognitive
disfunction," made him "not capable of working" are consistent with Dr. Gindes'
conclusions that Conklin's "ability to understand, remember, and apply simple
directions and instructions in moderately limited," that "[h]is abilities to
understand, remember, and apply complex directions and instructions and use
reason and judgment to make work-related decisions are extremely limited," and
that "[h]is abilities to interact adequately with supervisors, coworkers and the
public; sustain concentration, perform a task at a consistent pace, sustain an
ordinary routine and regular attendance at work, regulate emotions, control
behavior, and maintain well-being are markedly limited," as well as with Dr.
Gindes' PTSD diagnosis.  *Id.* at 401, 452.  Further, the ALJ concluded that Dr.
Gindes' opinion was not consistent with Conklin's "admitted activities of daily
living," even though Dr. Gindes noted in his evaluation that Conklin is "able to
dress, bathe, and groom himself," that he "occasionally cleans, and with his spouse, .
. . does laundry and goes out shopping."  *Id.* at 77–78, 451.  As Conklin described
the same routines in his hearing testimony, *id.* at 60–62, and Dr. Gindes also

expressly considered those activities in his evaluation, a reasonable factfinder could have determined that those daily activities *were* consistent with Dr. Gindes' conclusions.  The ALJ failed to explain why she concluded otherwise.

In support of the ALJ's decision, the Commissioner maintains that "an ALJ is not required to explicitly reconcile every shred of conflicting evidence, and does not have to state on the record every reason justifying a decision."  Comm'r Mem. at 20.[3]  But the ALJ here did not reconcile *any* evidence, and the regulations require her to "articulate . . . how persuasive [she] find[s] all" medical opinions and findings at a "[s]ource-level."  20 C.F.R. § 416.920c(b)–(b)(1).  The Commissioner further contends that an ALJ's decision may be upheld based on explanation and evidence elsewhere in the record.  Comm'r Mem. at 19.[4]  But the ALJ here did not discuss the supportability and consistency factors elsewhere in her opinion.

In sum, the ALJ's explanation of the supportability and consistency of Dr. Gindes' findings are out of compliance with 20 C.F.R. § 404.1520c(b)(2).  *See, e.g., McIntosh v. Kijakazi,* 20-CV-7354 (OTW), 2022 WL 2384151, at *4 (S.D.N.Y. Jul. 1, 2022) (ALJ failed to address supportability of medical opinion when he did not

---

[3] Notably, the Commissioner does not cite any post-2017 cases applying the current regulations to support this position.  *See* Comm'r Mem. at 20 (citing *Brault,* 683 F.3d at 448).  As discussed above, under the current, post-2017, regulations, an ALJ is required to "explain how [she] considered" both the supportability and consistency factors, as they are "the most important factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2).

[4] Nor does the Commissioner cite any post-2017 cases to support this position.  *See* Comm'r Mem. at 19–20 (citing *Salmini v. Comm'r of Soc. Sec.,* 371 F. App'x 109, 112 (2d Cir. 2010); *Mongeur,* 722 F.2d at 1040; *Pullins v. Comm'r of Soc. Sec.,* No. 18-CV-1303 (DB), 2019 WL 6724586, at *5 (W.D.N.Y. Dec. 11, 2019) (claim filed in 2014)).

consider source's "long and detailed report . . . [and] other 'checked' boxes or other notations"); *Acosta Cuevas*, 2021 WL 363682, at *14 (ALJ failed to properly apply supportability factor where "[n]owhere in [her] decision [did] she explain, as the new regulations require, what the respective [physicians] used to support their opinions and reach their ultimate conclusions"); *cf. Rosario*, 2022 WL 819810, at *10 (ALJ satisfied supportability factor by "analyzing [physician assistant's] underlying treatment records against her opinion, and finding an incongruity").

### 2.  The ALJ's Error Was Not Harmless

The ALJ's failure to properly evaluate Dr. Gindes' opinion was not harmless. Had the ALJ given more credit to his opinion in her RFC determination, she might have concluded that Conklin was disabled.  For instance, Dr. Gindes opined that Conklin's "abilities to understand, remember, and apply complex directions and instructions and use reason and judgment to make work-related decisions are extremely limited," and "abilities to interact adequately with supervisors, coworkers and the public; sustain concentration, perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work, regulate emotions, control behavior, and maintain well-being are markedly limited."  *Id.* at 452.  Those limitations, which are consistent with Conklin's testimony that he "ha[s] a split personality towards other people" and he "can't deal with crowds," AR at 74, are not accounted for in the current RFC, nor in the ALJ's determination that Conklin would be able to hold the jobs that the VE testified he was capable of holding.

The failure to properly assess Dr. Gindes' evaluation was "not harmless error" because "[h]ad the ALJ incorporated [these] . . . assessments in the RFC, the ALJ would have devised a different RFC determination." *Kevin R. v. Comm'r of Soc. Sec.*, No. 20-CV-6533 (FPG), 2021 WL 4025534, at *5 (W.D.N.Y. Sept. 3, 2021) (citing, *inter alia*, *Manuel v. Comm'r of Soc. Sec.*, No. 19-CV-23 (EAW), 2020 WL 2703442, at *4 (W.D.N.Y. May 26, 2020) (ALJ's failure to consider treating physician's opinion not harmless because restrictive limitations identified by physician could have resulted in finding of disability or more restrictive RFC finding if given proper consideration)); *see also Nichole L.Q. v. Kijakazi*, No. 20-CV-691 (BKS), 2022 WL 874398, at *10 (N.D.N.Y. Mar. 24, 2022) (errors that "implicate the ALJ's consideration of Plaintiff's subjective complaints . . . prohibit the Court from engaging in a meaningful review of the ALJ's RFC determination" and are "not harmless").

### 3. This Case Should be Remanded

Remand is appropriate when an ALJ fails to apply the correct legal standard, including adequate consideration and application of the new regulatory factors. *See, e.g., Acosta Cuevas*, 2021 WL 363682, at *9 ("just as under the previous regulations when failure to fully consider the *Burgess* factors . . . would be grounds for remanding an ALJ's decision, an ALJ's failure to adequately consider and apply the new regulatory factors also require a reviewing court to remand"). Because the ALJ did not sufficiently explain the supportability and consistency factors with respect to Dr. Gindes' opinion, the case must be remanded for further proceedings.

## III. CONCLUSION

For the foregoing reasons, Conklin's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk is directed to mark the motion at Docket Number 16 as "granted," and the motion at Docket Number 20 as "denied," and enter judgment for Conklin.

**SO ORDERED.**

Dated: January 5, 2023
     New York, New York

                           _____
                           JAMES L. COTT
                           United States Magistrate Judge